UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Willim Judah,

        Plaintiff,

v.

Keri A. Ovsak, RN; David Paulson, M.D.;
John Barry, M.D.; Laurel Sturlaugson, RN;
Michelle Breamer, RN, CNP; Susan L.
Johnson; Brittany K. Crock, R.N.; Heather
Blaschko, LPN; Christopher Schiffer;
Brenda Todd-Bense; John Gemlo, RN,
CNP; Steven T. Sturlaugson; Sharon Autio,
RN; Krista L. Gilpin, RN; Jensina Rosen;
Julie Rose; Deborah K. Barron; Nicole W.
Hawkins; Michael Zimmerman; Terrance
Kneisel; Charles E. Johnson; Jennifer Jones;
Breanna Guthmiller, Psy.D.; Scott Sutton;
David Rose; Michael Hettig; Gary Ankarlo,
Psy.D.; Elizabeth K. Peterson, Psy.D.;
Nicole Boder; Samuel A. Clark; Sara L.
Kulas; Ann Marie Linkert-Korhonen; Marie
R. Hartman; Nicole Oachs; Joseph Witz;
Brianna Hraban; Kimberly Ann Storm;
Andrew Bustos; John Doe (whose true name
is unknown); and State of Minnesota
Department of Human Services,

        Defendants.

File No. 21-cv-618 (ECT/LIB)

**OPINION AND ORDER**

---

Jordan S. Kushner, Law Office of Jordan S. Kushner, Minneapolis, MN, for Plaintiff.

Janine Wetzel Kimble, Minnesota Attorney General's Office, St. Paul, MN, for Defendants.

Willim Judah is civilly committed in the Minnesota Sex Offender Program ("MSOP"). In a ten-count Second Amended Complaint, he claims that the Minnesota Department of Human Services and thirty-nine individual state officials have violated his rights in numerous ways during his confinement. Defendants have moved to dismiss nine of the ten counts. Defendants' motion will be granted in part and denied in part.

I[1]

A

Judah has been civilly committed for years. Second Am. Compl. ("Compl.") ¶¶ 1, 4 [ECF No. 28]. From May 2014 until late 2017, he was confined in MSOP's St. Peter facility. *Id.* ¶ 46. Otherwise, MSOP has held him in its Moose Lake facility. *Id.* He alleges that, while in MSOP's custody, he has suffered "repeated and long-term deliberate indifference to [his] serious medical needs and intentional abuse[.]" *Id.* ¶ 1. He believes that all or most of this abuse was in retaliation for his complaints about his treatment and for filing a prior lawsuit against MSOP officials. *Id.* ¶ 143. The alleged misconduct falls into several categories. Given the issues raised in this motion, only a basic factual summary of each category is necessary.

*Bowel Issue.* In late 2014, Judah began experiencing severe pain during and after bowel movements. *Id.* ¶ 47. He alleges that, for more than a year, MSOP staff failed to adequately treat this pain and conducted unnecessarily painful and humiliating

---

[1]     In accordance with the standards governing a motion under Rule 12(b)(6), the facts are drawn entirely from the operative Second Amended Complaint. *See Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014).

examinations. *Id.* ¶¶ 47–59. He did not receive a colonoscopy from an "outside physician" until March 2016, and that procedure revealed a rectal tear that was "more than two inches long and a quarter inch deep[.]" *Id.* ¶ 60. At the outside physician's recommendation, Judah underwent surgery to address the problem. *Id.*

After the surgery, MSOP allegedly ignored Judah's recovery instructions and further exacerbated his medical issues. *Id.* ¶¶ 60–69, 71–75. Over the next several years, he underwent four more related surgeries. *Id.* ¶¶ 78, 91, 92, 105. Throughout this time, MSOP staff disregarded Judah's medical needs and subjected him to unnecessarily harsh conditions. For example, after one surgery, they transported him for 90 minutes "in full restraints" that included "a black box and heavy chains right on top of his surgical wound and protruding intestine[.]" *Id.* ¶ 78. After another, they forced him to move himself and his belongings multiple times to a different floor while he was still recovering, and he was not allowed to take meals in his room. *Id.* ¶¶ 93–104. Judah's abdominal problems persist to this day. *Id.* ¶¶ 110–12.

*Other Medical Issues*. Judah has a number of other medical problems that receive less attention in the Complaint. They include sleep apnea, *id.* ¶¶ 110, 113–14; "chronic, severe back pain," *id.* ¶ 115; "severe skin allergies" and "rashes," *id.* ¶¶ 116–17; and gall stones, *id.* ¶ 111. Defendants allegedly disregarded these problems, too, by withholding or delaying necessary treatment, failing to provide reasonable accommodations, and subjecting Judah to harsh living conditions.

*Interference with Property*. On a number of occasions, Defendants have allegedly denied Judah access to property he purchased. Some of this property, like a wedge pillow,

was directly related to Judah's medical needs.  *Id.* ¶¶ 105–06.  Other property, like a weighted 88-key keyboard, "religious materials," CDs and DVDs, mail, and "other basic non-harmful items," does not seem related to medical treatment.  *Id.* ¶¶ 87, 131–36, 140–41.  Judah alleges that these restrictions "lack any security justification."  *Id.* ¶ 139.

*Living Placements*.  In addition to forcing Judah to move living units multiple times while he recovered from a major surgery, Defendants allegedly placed Judah in "a living unit with far worse living conditions" and "in rooms that did not accommodate his medical conditions."  *Id.* ¶ 153.  For example, although he could have been assigned to a first floor room, he was placed on the second floor, forcing him "to go up and down stairs repeatedly during each day in order to get pain medications and to eat meals."  *Id.* ¶ 93.  On one occasion, Judah was required "to move out of a single room and into a room with another client who had recently admitted to raping his roommate."  *Id.* ¶ 89.

*False Treatment Reports*.  Judah alleges that MSOP staff have "continually interfered with, hindered[,] and sabotaged his progress through the MSOP treatment program[.]"  *Id.* ¶ 118.  They have done so by including false statements in his treatment reports, labeling him with unsupported mental-health diagnoses, and omitting information about his "treatment accomplishments."  *Id.* ¶¶ 118–29.  Judah believes this conduct is designed "to help keep [him] indefinitely confined."  *Id.* ¶ 128.

*Interference with Free Exercise of Religion*.  Defendants have also allegedly disrupted Judah's exercise of religion.  In addition to restricting his access to religious materials, including "four Bibles," Defendants have kept Judah from "conducting Bible

study sessions" because he "is not allowed to be in a position of teaching or leadership." *Id.* ¶ 138.  According to Judah, this restriction lacks "any legitimate justification."  *Id.*

*Interference with Legal Communications*.  Finally, Judah alleges Defendants have "refuse[d] to allow [him] or other prisoners necessary privacy when making legal phone calls."  *Id.* ¶ 137.  Specifically, the only phone available for such calls "is in an open area in the dining room" where other prisoners (and staff) can overhear the conversation.  *Id.* On one occasion, a Defendant "placed a legal phone call for [Judah], sat next to [him] as he spoke with his Attorney, listened to [the] call[,] and then wrote an incident report about the content of the call."  *Id.*  Defendants have "specifically denied [Judah's] request for legal phone calls in a private area[.]"  *Id.*

B

Judah filed the original Complaint in this case on March 3, 2021.  ECF No. 1.  The next day, he filed a "corrected" version of the Complaint.  ECF No. 7.  Defendants moved to dismiss that Complaint in part.  ECF No. 20.  After Judah responded by filing a First Amended Complaint, Defendants' initial motion to dismiss was denied as moot.  ECF Nos. 25, 27.  A few days later, with Defendants' consent, Judah filed a Second Amended Complaint, which is now his operative pleading.  ECF Nos. 28, 28-1.  In the Second Amended Complaint, which from now on will simply be referred to as "the Complaint," Judah asserts the following ten claims.

*Count 1: Deliberate Indifference to Medical Needs and Safety*.  Judah alleges that Defendants Keri Ovsak, David Paulson, John Barry, Laurel Sturlaugson, Jensina Rosen, Michelle Breamer, Brittany Crock, Heather Blaschko, Susan Johnson, Charles Johnson,

John Gemlo, Sharon Autio, Krista Gilpin, Julie Rose, Michael Zimmerman, David Rose, Michael Hettig, Terrance Kneisel, Scott Sutton, Nicole Boder, and Nicole Oachs violated his rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.   Compl. ¶¶ 146–48; *see* 42 U.S.C. § 1983.   They did so by showing "deliberate disregard for [his] serious medical needs" in a way that amounts to "cruel and unusual punishment."  Compl. ¶ 147.

*Count 2: Violations of Due Process – Unlawful Punishment*.  Judah alleges that "[a]ll of the above-named individual Defendants" violated his rights under the Due Process Clause of the Fourteenth Amendment by "subjecting [him] to conditions of civil confinement that constitute punishment."  *Id.* ¶ 150; *see* 42 U.S.C. § 1983.

*Count 3: First Amendment Retaliation*.  Judah alleges that "[a]ll of the above-named individual Defendants" violated his rights under the First Amendment by "retaliating against [him] for expressing grievances or objections to his mistreatment at MSOP, both verbally and through written correspondence, and for his previous lawsuit against MSOP and DHS officials."  Compl. ¶ 153; *see* 42 U.S.C. § 1983.  The alleged retaliatory conduct included placing Judah in a "living unit with far worse living conditions," withholding medically necessary treatment and accommodations from him, forcing him to move himself and his belongings "while he was in severe medical distress," and depriving him of "property and basic living amenities."  Compl. ¶ 153.

*Count 4: First Amendment Free Exercise of Religion*.  Judah claims that Defendants Steve Sturlaugson, Susan Johnson, Julie Rose, Samuel Clark, Sara Kulas, and Ann Marie Linkert-Korhonen violated his First Amendment right to the free exercise of religion by

6

"prohibiting him from having access to religious materials and discussing his religious beliefs and interests with others."  *Id.* ¶ 156; *see* 42 U.S.C. § 1983.

*Count 5: Right to Counsel and Access to Courts.*  Judah claims that Defendants Michael Zimmerman, Terrance Kneisel, Susan Johnson, and Brianna Hraban violated his rights under the Fifth, Sixth, and Fourteenth Amendments to access counsel and the courts by "preventing private communication with his attorney."   Compl. ¶ 159; *see* 42 U.S.C. § 1983.

*Count 6: Failure to Train and Supervise.*  Judah claims that the "[a]bove-named individual supervisory Defendants" violated his constitutional rights by "failing to properly train and supervise other Defendants and MSOP staff" concerning "the constitutional and other rights of MSOP patients," patients' "medical care and safety," and "constitutional treatment practices of confined person[s]."  Compl. ¶ 162.  Judah does not invoke a specific constitutional provision in this count.

*Count 7: Unconstitutional Custom or Practice.*  Judah claims that the "[a]bove-named individual supervisory Defendants" violated his constitutional rights by "engaging in policies, customs or practices of disregarding medical needs and safety" and the "rights of free speech and free exercise of religions," as well as by "engaging in unlawful punishment."  *Id.* ¶ 165.  Again, Judah does not invoke a specific constitutional provision in this count.

*Count 8: Disability Discrimination.*  Judah claims that Defendant Minnesota Department of Human Services ("DHS") has violated the Americans with Disabilities Act

("ADA"), 42 U.S.C. § 12132, by "denying him benefits of services and programs because of his disabilities" and by "failing to accommodate [his] disabilities."  Compl. ¶ 170.

*Count 9: Retaliation and Coercion*.   Judah also claims that "Defendants" have discriminated against him "because he has opposed acts and practices made unlawful by" the ADA, 42 U.S.C. § 12203.  Compl. ¶ 173.

*Count 10: Negligence*.   Finally, Judah claims that the "individually named Defendants" have breached their duties to "exercise a reasonable standard of care to protect [him] from harm and injury."  *Id.* ¶ 176.  As for Defendants "who were acting in the course of their duties as health care providers," they breached their legal duties by "deviating from the standard of care applicable to their respective professions," thereby causing his injuries.  *Id.*

Judah seeks declaratory and injunctive relief, compensatory and punitive damages, costs, and attorneys' fees.  *Id.* at 56–57.  He clarifies that "[a]ll individual [D]efendants . . . are being sued in both their personal and official capacities," but that he is asserting his money damages claims against the individual Defendants "in their personal capacities" only.  *Id.* ¶ 44.

II

In reviewing a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor.  *Gorog*, 760 F.3d at 792 (citation omitted). Although the factual allegations need not be detailed, they must be sufficient to "raise a right to relief above the speculative level . . . ."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

555 (2007) (citation omitted).  The complaint must "state a claim to relief that is plausible on its face."  *Id.* at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

III

In their motion, Defendants challenge the sufficiency of Judah's allegations on nine of the ten counts asserted in the Second Amended Complaint.[2]  Their arguments range from the procedural to the substantive, and they will be addressed in turn.

A

As an initial matter, Defendants argue that six of Judah's claims—Counts 2, 3, 6, 7, 9, and 10—should be dismissed in their entirety because they do not comply with Federal Rule of Civil Procedure 8's directive to provide a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  In Defendants' view, Judah "employs an impermissible shotgun approach" in the challenged counts because he "generally does not identify which claims are brought against which Defendants."  Defs.' Mem. in Supp. at 22–24.  Judah responds that his allegations are specific enough for this stage of the litigation.  Pl.'s Mem. in Opp'n at 18–19.

Courts in this District have consistently rejected "kitchen-sink" or "shotgun" complaints—"complaints in which a plaintiff brings every conceivable claim against every conceivable defendant."  *Gurman v. Metro Hous. & Redevelopment Auth.*, 842 F. Supp. 2d

---

[2]   Defendants explicitly "seek[] no relief as to Count 8."  Defs.' Mem. in Supp. at 2 n.1 [ECF No. 32].

1151, 1153 (D. Minn. 2011); *see also Sellors v. Obama*, No. 13-cv-2484 (SRN/JSM), 2014 WL 1607747, at *10 (D. Minn. Apr. 15, 2014); *Liggins v. Morris*, 749 F. Supp. 967, 971 (D. Minn. 1990). "A complaint which lumps all defendants together and does not sufficiently allege who did what to whom, fails to state a claim for relief because it does not provide fair notice of the grounds for the claims made against a particular defendant." *Tatone v. SunTrust Mortg., Inc.*, 857 F. Supp. 2d 821, 831 (D. Minn. 2012). This type of pleading "unfairly burden[s] defendants and courts" because it gives them the primary responsibility to identify the basis of the plaintiff's claims. *Gurman*, 842 F. Supp. 2d at 1153.

Judah's Complaint could be clearer in many respects. Counts 2 and 3 seek relief against "[a]ll of the above-named individual Defendants." Compl. ¶¶ 150, 153. Counts 6 and 7 seek relief against the "[a]bove-named individual supervisory Defendants." *Id.* ¶¶ 162, 165. And Counts 9 and 10 simply seek relief against "Defendants." Compl. ¶¶ 173, 176. According to Judah, this is permissible because, "[a]t this point in the lawsuit[,] there are grounds to believe that all Defendants" (or, with respect to Counts 6 and 7, all Defendants in supervisory roles) engaged in the conduct challenged in those counts. Pl.'s Mem. in Opp'n at 18.

Read in isolation, these paragraphs could run afoul of Rule 8 because they appear to lump all Defendants together indiscriminately. Read in the context of the Complaint as a whole, however, Judah makes each Defendant's role in the case reasonably apparent. The Complaint begins by setting out a paragraph for each individual Defendant, stating that Defendant's role at MSOP, whether the role was supervisory in nature, and a brief,

10

one-sentence description of the Defendant's allegedly unlawful conduct.  *See* Compl. ¶¶ 5–43.  After that comes a wide-ranging factual narrative of the events giving rise to Judah's claims, in which Judah consistently uses the names of specific Defendants when describing the alleged conduct.  *See id.* ¶¶ 46–141.  To be sure, Judah could have repeated all of this information under each separate claim for relief, and doing so would arguably have made it easier to respond to the Complaint.  But this is not the type of shotgun pleading that warrants dismissal under Rule 8.  The Federal Rules do not prohibit Judah from raising many claims against many Defendants.  The format he has chosen provides fair notice of his claims and enough information to reasonably expect Defendants to connect the dots. Whether Judah has plausibly alleged the substance of his claims is a separate question.

B

Moving to the substance of Judah's claims, Defendants first argue that Judah's ADA retaliation claim (Count 9) should be dismissed as to all individual Defendants because the statute does not authorize individual liability for such claims.  Defs.' Mem. in Supp. at 11; Defs.' Reply Mem. at 2–4 [ECF No. 37].  Judah responds that the ADA authorizes individual liability for retaliation "in the public services context."  Pl.'s Mem. in Opp'n at 5–6 [ECF No. 36].

The Parties' arguments raise a difficult issue of statutory interpretation that has inspired disagreement among the courts that have considered it.  Understanding the issue requires a bit of context.  The provisions of the ADA are divided among four subchapters in Title 42 of the United States Code.  Subchapter I addresses the rights of individuals with disabilities in employment.  *See* 42 U.S.C. §§ 12111–12117.  Subchapter II addresses the

11

rights of individuals with disabilities in "public services." *Id.* §§ 12131–12165. Subchapter III addresses the rights of individuals with disabilities in public accommodations and services operated by private entities. *Id.* §§ 12181–12189. Each of these subchapters prohibits, among other things, discrimination on the basis of an individual's disability. *See id.* §§ 12112 (discrimination in employment), 12132 (discrimination in public services), 12182 (discrimination in public accommodations).

Subchapter IV contains various "miscellaneous provisions." *Id.* §§ 12201–12213. One such provision, which Judah invokes, says that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." *Id.* § 12203(a).[3] The provision goes on to say that "[t]he remedies and procedures available under sections 12117, 12133, and 12188 of this title shall be available to aggrieved persons for violations of [§ 12203], with respect to subchapter I, subchapter II and subchapter III, respectively." *Id.* § 12203(c). Put more simply, the remedies available for a violation of § 12203(a) depend on the context in which the alleged retaliation arises. *See Steen v. Target Corp.*, No. 09-cv-2108 (JNE/SER), 2011 WL 13318282, at *6 (D. Minn. Jan. 18, 2011). For example, a plaintiff alleging retaliation in the public-services context may invoke the

---

[3]     Section 12203 also makes it unlawful to "coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of . . . any right granted or protected by" the ADA. 42 U.S.C. § 12203(b). Judah appears to raise claims under both subsections, but there does not seem to be any relevant difference between the two for purposes of this discussion.

remedies available under section 12133, the remedies provision for subchapter II of the ADA. *See Shotz v. City of Plantation*, 344 F.3d 1161, 1169 (11th Cir. 2003).

Unfortunately, looking to section 12133 only reveals more breadcrumbs. It says that "[t]he remedies, procedures, and rights set forth in section 794a of title 29 [the Rehabilitation Act] shall be the remedies, procedures, and rights this subchapter provides to any person alleging discrimination on the basis of disability in violation of section 12132 of this title." *Id.* § 12133. Turn, then, to the Rehabilitation Act.

"The appropriate remedy under the Rehabilitation Act depends on the status of the plaintiff. Employees and applicants for employment . . . are subject to . . . the remedies of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(f) to (k)." *Randolph v. Rodgers*, 253 F.3d 342, 346 (8th Cir. 2001). "Aggrieved persons who are not employees or applicants for employment," like Judah, "are subject to . . . the remedies of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d to 2000d-7." *Id.* at 347. Title VI, in turn, is "silent as to remedies," *Shotz*, 344 F.3d at 1169, but the Supreme Court has held that private individuals may sue to enforce it, *see Alexander v. Sandoval*, 532 U.S. 275, 280 (2001).

In sum, to assert an ADA retaliation claim under § 12203 in the public-services context, Judah can invoke the remedies available for a violation of subchapter II of the ADA. Subchapter II incorporates the remedies available for a violation of the Rehabilitation Act. And, in this context, the Rehabilitation Act incorporates the remedies available for a violation of Title VI.

Two apparently competing features of § 12203 make it difficult to determine whether Judah can assert an ADA retaliation claim against Defendants in their individual capacities. First, § 12203 prohibits retaliatory conduct by "person[s]." 42 U.S.C. § 12203(a). Subchapter IV of the ADA, where § 12203 appears, does not define the word "person." But Subchapter I defines it to include "one or more individuals." *Id.* § 12111(7); *see id.* § 2000e(a). And in any event, the plain meaning of the word "person" unquestionably includes individuals. *See Person*, American Heritage Dictionary of the English Language (5th ed.), https://www.ahdictionary.com/word/search.html?q=person (last visited July 25, 2021).

Second, as noted above, § 12203 expressly incorporates the remedies available under subchapter II of the ADA, the Rehabilitation Act, and Title VI. The Eighth Circuit has held that subchapter II of the ADA does not contemplate individual liability. *See Randolph*, 253 F.3d at 348; *Alsbrook v. City of Maumelle*, 184 F.3d 999, 1005 n.8 (8th Cir. 1999) (en banc). And, while the Eighth Circuit has not addressed the question, most courts have concluded that the Rehabilitation Act and Title VI do not authorize individual liability, either. *See Shotz*, 344 F.3d at 1169 & n.11 (Title VI); *A.W. v. Jersey City Pub. Sch.*, 486 F.3d 791, 805–06 (3d Cir. 2007) (Rehabilitation Act).

These two features have created a fault line between the courts that allow individual liability under § 12203 and the courts that prohibit it. Some have concluded, based primarily on the statute's application to "person[s]," that § 12203 contemplates individual liability for retaliation in the public-services context. *See, e.g.*, *Shotz*, 344 F.3d at 1179–80; *Datto v. Harrison*, 664 F. Supp. 2d 472, 491–92 (E.D. Pa. 2009); *Glenn v. Davis Sch. Dist.*,

No. 1:19-cv-00008-DAK, 2019 WL 5423728, at *5–8 (D. Utah Oct. 23, 2019); *Minkley v. Eureka City Sch.*, No. 17-cv-3241-PJH, 2017 WL 4355049, at *6–8 (N.D. Cal. Sept. 29, 2017); *Alston v. Dist. of Columbia*, 561 F. Supp. 2d 29, 41–42 (D.D.C. 2008); *Zied-Campbell v. Richman*, No. 1:04-CV-0026, 2007 WL 1031399, at *18 (M.D. Pa. Mar. 30, 2007).   Other courts have concluded, based on the provision's incorporation of remedies from other statutes, that § 12203 does not contemplate individual liability.   If those other statutes do not allow individual liability, the argument goes, then it necessarily flows that § 12203 does not allow it, either.   *See Baird ex rel. Baird v. Rose*, 192 F.3d 462, 471–72 (4th Cir. 1999); *Key v. Grayson*, 163 F. Supp. 2d 697, 703–04 (E.D. Mich. 2001); *B.K. ex rel. Keller v. Lake Oswego School Dist.*, No. 3:11-cv-278-JE, 2012 WL 844222, at *2–3 (D. Or. Mar. 12, 2012); *N.T. v. Espanola Pub. Sch.*, No. Civ 04-0415 MCA/DJS, 2005 WL 5840479, at *10–14 (D.N.M. May 20, 2005).

Considering the statutory text and available authorities, the better answer is that § 12203 authorizes individual liability in the public-services context.   First, as already noted, the statute prohibits retaliation by "person[s]."   This term includes individuals, and it is a distinct difference from subchapter II of the ADA, which only prohibits discrimination by "public entit[ies]."   42 U.S.C. § 12132.   A "public entity" under subchapter II is a "[s]tate or local government" or a "department, agency, special purpose district, or other instrumentality" of such a government—*i.e.*, not an individual.   *Id.* § 12131(1); *see Alsbrook*, 184 F.3d at 1005 n.8.   So, § 12203 regulates the conduct of a wider range of entities than subchapter II, and it is logical that its remedies would extend to the full range of regulated parties.   Second, when the Eighth Circuit determined that

subchapter II does not authorize individual liability for disability discrimination, it relied solely on the fact that the statute prohibits discrimination by a "public entity." *Alsbrook*, 184 F.3d at 1005 n.8.   In other words, the court relied on § 12132's rights-creating language, not its provision incorporating remedies from the Rehabilitation Act.  Doing the same thing here leads to a relatively simple conclusion: because § 12203 prohibits retaliation by individuals and provides a remedy for such retaliation, it authorizes retaliation claims against individuals, at least absent some textual reason to conclude otherwise.

There are other reasons to reject Defendants' argument.  If they are correct that an incorporation-of-remedies provision determines the set of proper defendants, then a plaintiff suing for either retaliation or disability discrimination in the public-services context would also have to show that the defendant receives federal funds.  This is because, as noted above, subchapters II and IV of the ADA ultimately incorporate the remedies available under the Rehabilitation Act and Title VI, which only apply to recipients of "Federal financial assistance."   42 U.S.C. §§ 794, 2000d.   Research has revealed no examples of a court requiring an ADA plaintiff to make that showing.[4]  And what about proper plaintiffs?  Subchapter II only protects "qualified individual[s] with a disability." *Id.* § 12132.  Subchapter IV goes further, protecting "any individual" who "has opposed any act or practice made unlawful" under the ADA or who has participated in an ADA

---

[4]      No doubt all or most public entities—proper defendants in a public-services disability-discrimination case—receive federal funding as a factual matter.  But the relevant question is what legal requirements the statute and courts applying it impose.

investigation or proceeding.  *Id.* § 12203(a).  A corollary of Defendants' argument is that only qualified individuals with a disability could sue for retaliation in the public-services context under subchapter IV.  But courts have soundly rejected this proposition.  *See Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 502 (3d Cir. 1997).  These logical considerations further support the conclusion that § 12203 contemplates individual liability for retaliation.

In short, statutory text and Eighth Circuit precedent suggest that Judah may bring his ADA retaliation claim against the individual Defendants in their individual capacities. Because Defendants do not otherwise challenge the sufficiency of his allegations on that claim, it would be inappropriate to dismiss it.

C

Next, Defendants argue that Judah's "unconstitutional custom or practice" claim (Count 7) should be dismissed for two reasons.  First, they understand it as a claim for municipal liability under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), and *Monell* claims are "not viable against the State."  Defs.' Mem. in Supp. at 12.  Second, they argue Judah has failed to state a plausible claim because he does not allege the personal involvement of any supervisor, nor does he identify a specific policy or custom.  *Id.* at 13–15.  Judah responds that Defendants' *Monell* characterization is improper and that he has properly stated a claim against the "individual supervisory Defendants" for participating in the violation of his constitutional rights.  Pl.'s Mem. in Opp'n at 10.

The premise of Defendants' first argument—that Judah is raising an improper *Monell* claim—is flawed. *Monell* allows a plaintiff to sue a municipality and its officials in their official capacity for constitutional violations that result from the municipality's policies or customs. *See Malone v. Hinman*, 847 F.3d 949, 955 (8th Cir. 2017). Judah is not suing a municipality, and he is clear that Count 7 is directed at the "supervisory Defendants" in their "individual" capacities. Compl. ¶¶ 162, 165; *see* Pl.'s Mem. in Opp'n at 7. So, although Defendants are correct that a plaintiff may not bring a *Monell* claim against the state, that principle alone does not defeat Count 7.

Nonetheless, it is appropriate to dismiss Count 7. A state supervisory official may be liable in her individual capacity if she is "involved in 'creating, applying, or interpreting a policy' that gives rise to unconstitutional conditions." *Jackson v. Nixon*, 747 F.3d 537, 543 (8th Cir. 2014). The Parties' briefing centers around three policies discussed in the Complaint. The first is a policy requiring MSOP patients to be placed in full restraints when transported. Judah argues that it was unconstitutional for MSOP to apply this policy to him after his abdominal surgery because the restraints were placed "directly over" his "fresh incisions," causing "excruciating pain and distress." Compl. ¶ 78. The problem is that Judah has not identified any Defendant in a supervisory role who was involved in creating, applying, or interpreting the restraint policy. Nicole Oachs and John Doe, who allegedly restrained him, are identified in the Complaint as "security staff person[s]." Compl. ¶¶ 39, 43, 78.[5] Judah does allege that he complained about the policy to Michelle

---

[5]     Judah only asserts Count 7 against "supervisory" Defendants, and he does not argue (nor could he, based on the Complaint's descriptions) that Oachs and Doe held

Breamer, who "claimed that she would issue instructions to reduce restraints," *id.* ¶ 78, but the Complaint says that Breamer is a "nursing [supervisor]," *id.* ¶ 9, and Judah alleges no facts plausibly showing that she has a role in setting MSOP's transportation policies.  On the contrary, the Complaint suggests that Judah simply asked Breamer for a medical exception to the policy.  *See Beaulieu v. Ludeman*, 690 F.3d 1017, 1031–32 (8th Cir. 2012) (generally upholding the constitutionality of MSOP's transportation restraint policy and observing that "modifications are made" to the policy "for medical emergencies or medical conditions").

Next, Judah argues that MSOP changed its policy "to limit the size of his keyboard that he uses for his committed hobby of playing music," and that this policy is unconstitutional because it lacked a "security justification."  Pl.'s Mem. in Opp'n at 9; Compl. ¶ 136.  Whether or not Judah has adequately alleged personal involvement of a supervisory Defendant in creating or implementing this policy, he has not plausibly alleged that the policy is unconstitutional.  A restriction unconstitutionally infringes a civilly committed individual's liberty if it amounts to "punishment." *Karsjens v. Lourey*, 988 F.3d 1047, 1052 (8th Cir. 2021) (quoting *Bell v. Wolfish*, 441 U.S. 520, 538 (1979)).  "In analyzing whether a condition of confinement is punitive, courts 'decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Id.*  Significantly for this case, however, "there is a *de minimis* level of imposition with which the Constitution is not concerned." *Smith v.*

---

"supervisory" positions.  It is therefore not necessary to decide whether they could be liable for "applying" the restraint policy.

*Copeland*, 87 F.3d 265, 268 (8th Cir. 1996) (citing *Bell*, 441 U.S. at 539 n.21).  Judah does not allege that the challenged policy denies him access to all musical instruments or even to all keyboards (indeed, the Complaint says that he was already "teaching [] piano and guitar to other clients," Compl. ¶ 130); it merely limits keyboards to a certain size. *Id.* ¶ 136.  He cites no authority for the proposition that a policy involving this type of *de minimis* denial of access to recreational property could amount to unconstitutional punishment.[6]  *See, e.g.*, *Smith*, 87 F.3d at 268 (holding that a pretrial detainee's exposure to the stench of urine and feces in his cell for four days was a *de minimis* condition that did "not rise to a level of constitutional significance"); *see also Welsh v. Correct Care Recovery Sols.*, 845 F. App'x 311, 324 (5th Cir. 2021) (rejecting a claim of "punitive confinement conditions" premised on the denial of "certain property such as electronics, snacks, and clothes"); *Ahlers v. Rabinowitz*, 684 F.3d 53, 65 n.8 (2d Cir. 2012) (stating that a civilly committed person's interest in "mail-order catalogs and similar materials borders on *de minimis*"); *Nickens v. White*, 536 F.2d 802, 803 (8th Cir. 1976) (per curiam) (holding that a prisoner's interest in a catalog was *de minimis*).

Finally, Judah alludes to an "institutional policy of employment [sic] therapists who lack licenses or other qualifications necessary to provide treatment[.]" Pl.'s Mem. in Opp'n at 9; Compl. ¶ 144.  He does not, however, plausibly identify any individual supervisory Defendant who was involved in "creating, applying, or interpreting" such a policy.

---

[6]     Judah argues that he alleges other denials of property that "can be inferred to be based on policy." Pl.'s Mem. in Opp'n at 9.  But absent facts plausibly showing that an unconstitutional policy or custom actually existed, this type of inference is not justified. *See Gherity v. Pfaff*, 216 F. Supp. 3d 975, 979 (D. Minn. 2016).

*Jackson*, 747 F.3d at 543 (citation omitted).   For all these reasons, it is appropriate to dismiss Count 7.

D

Next, Defendants argue that portions of Judah's claims should be dismissed because he has not sufficiently alleged the personal involvement of certain individual Defendants. "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010) (quoting *Iqbal*, 556 U.S. at 676).   "[A] supervising officer can be held liable for an inferior officer's constitutional violation only if he directly participated in the constitutional violation, or if his failure to train or supervise the offending actor caused the deprivation." *Id.* (internal quotation marks and citation omitted).   And, as noted above, a supervisor may "directly participate[]" in a constitutional violation by "'creating, applying, or interpreting a policy' that gives rise to unconstitutional conditions." *Jackson*, 747 F.3d at 543 (citation omitted).

1

Defendants argue that Judah's deliberate-indifference claim (Count 1) should be dismissed as to Defendants Jensina Rosen, Susan Johnson, David Rose, and Terrance Kneisel because Judah does not include enough allegations specific to those individuals. Defs.' Mem. in Supp. at 16–18.   Judah responds that he has done enough for the pleading stage. *See* Pl.'s Mem. in Opp'n at 10–14.   Courts apply the Eighth Amendment's deliberate indifference standard to a civilly committed patient's Fourteenth Amendment claim for "deficient medical care." *Mead v. Palmer*, 794 F.3d 932, 936 (8th Cir. 2015).   To prevail

21

at this stage, Judah must allege facts plausibly showing that Defendants "knew about excessive risks to his health but disregarded them, and that their unconstitutional actions in fact caused his injuries." *Karsjens v. Lourey*, 988 F.3d 1047, 1052 (8th Cir. 2021) (quoting *Senty-Haugen v. Goodno*, 462 F.3d 876, 889–90 (8th Cir. 2006)).

Judah alleges that Defendant Jensina Rosen is a "property supervisor at MSOP in Moose Lake" who violated his rights "by denying [him] access to medically indicated and properly purchased items, including a back brace and abdominal binder." Compl. ¶ 20. Later in the Complaint, Judah alleges that an MSOP physical therapist recommended that he purchase a "combination abdominal binder and back brace" to address his "severe back pain." Compl. ¶ 115. When the binder arrived, Judah was told he could not have it "because it had metal springs embedded deep within it," and a different Defendant, Keri Ovsak, later stated that the binder was refused because she "mistakenly believed that [it] was not medically necessary[.]" *Id.* Judah eventually received a different binder, "but it did not fit properly." *Id.* At most, these allegations show that Rosen was involved in denying Judah access to his back brace. No allegations plausibly show Rosen's subjective awareness of Judah's medical conditions or that the denial would involve excessive risks to his health. It is therefore appropriate to dismiss Count 1 as to Rosen.[7]

Judah describes Defendant Susan Johnson as a "supervisor of health services at MSOP" who violated his rights by "ignoring [his] properly submitted grievances, resulting in further neglect of [his] serious medical needs." Compl. ¶ 10. Beyond this vague

---

[7]    Judah also alleges that Rosen was involved in denying him access to an 88-key keyboard, Compl. ¶ 134, but he does not argue that this was related to a medical need.

allegation, Judah states that Johnson was involved in denying him access to a keyboard and in preventing him from making private legal calls, neither of which seem to have anything to do with medical needs.  *See id.* ¶¶ 133, 135, 137.  These allegations do not plausibly show Johnson's subjective awareness of, much less deliberate disregard for, Judah's medical needs, and it is therefore appropriate to dismiss Count 1 as to her.

Terrance Kneisel is the "Associate Director at MSOP Moose Lake."  Compl. ¶ 25.  Judah generally alleges that Kneisel "refus[ed] to address [his] serious medical complaints" and "den[ied] his tier advancement and then destroyed the documentation[,] thereby preventing progress in treatment and ensuring his permanent confinement."  *Id.*  Later in the Complaint, he more specifically alleges that Kneisel denied a request for "private legal calls."  *Id.* ¶ 137.  Most of these allegations have nothing to do with Judah's medical condition or treatment.  The general allegation that Kneisel refused to address Judah's medical complaints does not plausibly show that Kneisel was subjectively aware of, but deliberately disregarded, a serious medical condition.  It is therefore appropriate to dismiss Count 1 as to him.

The result is different for David Rose, a "lead security officer" who allegedly forced Judah "to change rooms and floors while he was suffering from injuries from the aftermath of surgeries."  Compl. ¶ 11.  Their relevant interactions occurred on April 2 and 9, 2019, when Judah was "still bleeding" from an abdominal surgery.  *Id.* ¶ 98.  At the time, Judah "had a large gaping hole on the right side of his abdomen from the removal of [an] ileostomy bag, a fresh incision from his groin to sternum, and an open wound on the left side from the placement of [a] new colostomy bag."  *Id.*  He "also had orange looking

23

pressure blisters around his stomach[.]" *Id.* Rose allegedly "continued to insist that" Judah move rooms even after Judah "repeatedly explained his suffering and showed his injuries to" Rose. *Id.* ¶ 101. The move required Judah to "repeatedly go up and down stairs" and to carry his belongings, and the process "exacerbated his grave physical condition and symptoms." *Id.* ¶¶ 99–100. These allegations make it plausible that Rose was subjectively aware of Judah's medical needs because he personally observed Judah's wounds and heard Judah's complaints. *See, e.g.*, *Moore v. Jackson*, 123 F.3d 1082, 1086–87 (8th Cir. 1997) (reversing a grant of summary judgment where defendants had received plaintiff's written complaints of plaintiff's tooth pain). Rose allegedly disregarded those needs when he persisted in ordering Judah to move on multiple occasions. At this early stage, Judah has adequately alleged Rose's personal involvement in a constitutional violation.

2

Next, Defendants argue that Judah's free-exercise claim should be dismissed as to Defendants Susan Johnson, Samuel Clark, Sara Kulas, and Ann Marie Linkert-Korhonen because the allegations against these Defendants "do not refer in any way to [Judah's] religion or his practice of religion." Defs.' Mem. in Supp. at 19. Judah essentially agrees, acknowledging that the Second Amended Complaint "leave[s] out details" to support his claims against these Defendants and requesting an opportunity to further amend his Complaint. Pl.'s Mem. in Opp'n at 15.

Defendants are correct that Judah has not plausibly alleged the personal involvement of these Defendants in a violation of his right to free exercise of religion. As noted above, Judah alleges that Susan Johnson denied his requests for a keyboard and for private legal

phone calls, but nothing suggests that these requests related to Judah's religious practice.[8]
Samuel Clark, Sara Kulas, and Ann Marie Linkert-Korhonen are all staff members of
MSOP in Moose Lake who allegedly kept Judah from receiving a wedge pillow
recommended by his surgeon, Compl. ¶¶ 34–36, 105, and Kulas was also involved in
withholding Judah's mail, *id.* ¶ 141.   No allegations against these Defendants draw a
connection between their conduct and Judah's exercise of religion.   Count 4 will
accordingly be dismissed as to Susan Johnson, Clark, Kulas, and Linkert-Korhonen.

E

Defendants argue that Judah has not stated a plausible claim for a denial of his right
to counsel or access to courts because he has not identified any "actual injury or prejudice"
resulting from Defendants' conduct.  Defs.' Mem. in Supp. at 19–20.  Judah responds that
he has alleged a "concrete intrusion" into his attorney-client relationship, "which must
inherently be construed as injurious."  Pl.'s Mem. in Opp'n at 15–16.

A plaintiff claiming a denial of access to legal materials, counsel, or the courts must
plausibly allege "that he suffered an actual injury or prejudice as a result of the alleged
denial of access."  *Johnson v. Hamilton*, 452 F.3d 967, 973–74 (8th Cir. 2006) (citing
*Klinger v. Dep't of Corr.*, 107 F.3d 609, 616–17 (8th Cir. 1997)).[9]  What this means is that,

---

[8]      At the hearing on Defendants' motion, Plaintiff's counsel specifically abandoned
the free-exercise claim against Susan Johnson.

[9]      Judah invokes the Fifth, Sixth, and Fourteenth Amendments to support this claim.
Compl. ¶ 159.  Defendants argue that the Sixth Amendment doesn't apply because Judah
is not facing a criminal proceeding and that the Fifth Amendment doesn't apply because
this case does not involve Judah's privilege against self-incrimination.  Defs.' Mem. in
Supp. at 19–20.  It is not necessary to locate the constitutional source of the right Judah

because of Defendants' conduct, "a nonfrivolous legal claim [was] frustrated or was being impeded." *Lewis v. Casey*, 518 U.S. 343, 353 (1996) (footnotes omitted); *see Evenstad v. Herberg*, 994 F. Supp. 2d 995, 1003–04 (D. Minn. 2014).

Under this standard, Judah has not alleged a plausible claim.  He alleges that, on one occasion, Defendant Brianna Hraban placed a legal call for him, listened to his conversation with his attorney, and then "wrote an incident report about the content of the call." Compl. ¶ 137.  Other Defendants then denied Judah's request for private legal phone calls.  *Id.*  Regardless of whether this conduct could pose constitutional or other legal problems in other contexts, Judah has not alleged that Defendants prevented him from contacting his attorney in other ways—*e.g.*, by mail—and he has not alleged that he was prevented from asserting a nonfrivolous legal claim.  Judah argues that the invasion of his right to converse privately with his attorney *per se* satisfies the injury-and-prejudice requirement, but he cites no authority for this proposition.  *See Arney v. Simmons*, 26 F. Supp. 2d 1288, 1296 (D. Kan. 1998) (requiring a plaintiff who alleged that a prison guard overheard his telephone call with an attorney to satisfy the *Lewis* injury-and-prejudice standard); *Cf. United States v. Singer*, 785 F.2d 228, 234 (8th Cir. 1986) (requiring a criminal defendant raising a Sixth Amendment claim to show a "knowing[] instru[sion] into the attorney-client relationship" and "that the intrusion demonstrably prejudiced the defendant or created a substantial threat of prejudice" (citation omitted)); *Tucker v. Randall*, 948 F.2d 388, 391 (7th Cir. 1991) (stating that prison officials "may tape a

---

asserts with any precision because he has not alleged a plausible claim under Eighth Circuit precedent.

prisoner's telephone conversations with an attorney . . . if such taping does not substantially affect the prisoner's right to confer with counsel").

F

Defendants argue that Judah has failed to state a plausible negligence claim. In their view, Judah has only alleged negligence related to his health care. Such claims would not be viable against any non-health-care-provider Defendants, and any malpractice claims against health-care providers fail because Judah has not served an expert affidavit required under Minnesota law. Defs.' Mem. in Supp. at 21–22.[10] Judah responds that his negligence claims sweep more broadly than medical malpractice and that, in any event, the lack of an expert affidavit does not require dismissal. Pl.'s Mem. in Opp'n at 16–17.

First, although the Complaint could be clearer, Judah does seem to identify two separate duties of care. He first states that Defendants failed to "exercise a reasonable standard of care to protect [him] from harm and injury." Compl. ¶ 176. He then goes on to claim that those Defendants "who were acting in the course of their duties as health care providers . . . deviat[ed] from the standard of care applicable to their respective professions[.]" *Id.* This undermines Defendants' argument that Judah raises "only one negligence claim—arising under the health care provider duty of care," and other than the Rule 8 argument discussed above, Defendants do not seem to challenge the substance of

---

[10]    In their opening brief, Defendants argued that Judah's negligence claim should be dismissed under 28 U.S.C. § 1367(c). Defs.' Mem. in Supp. at 20–21. Defendants withdrew this argument in their reply brief after acknowledging that they do not seek dismissal of all of Judah's federal claims. Defs.' Reply Mem. at 9–10.

Judah's allegations against the non-health care provider Defendants.  Defs.' Reply Mem. at 10.

Defendants' second argument requires more discussion.  Under Minnesota law, a plaintiff "alleging malpractice, error, mistake, or failure to cure . . . against a health care provider" must generally "serve upon defendant with the summons and complaint an affidavit" showing that an expert has reviewed the facts of the case and determined that the defendant "deviated from the applicable standard of care[.]"  Minn. Stat. § 145.682, subds. 2(1), 3(1).  Defendants believe that failure to comply with this requirement warrants automatic dismissal, but the statute says something different.  "[M]andatory dismissal with prejudice" results only when the plaintiff has not provided the expert review affidavit "within 60 days after demand for the affidavit[.]"  *Id.* § 145.682, subd. 6(a); *see Martinez v. Bureau of Prisons*, No. 15-cv-2636 (WMW/TNL), 2016 WL 5796798, at *3–4 (D. Minn. Sept. 30, 2016); *Paulos v. Johnson*, 502 N.W.2d 397, 399 (Minn. Ct. App. 1993).[11]

Dismissal of Judah's medical-malpractice-based negligence claims is warranted because Defendants have implicitly demanded an expert-review affidavit, and Judah has not provided it.  A "demand" under section 145.682 need not be formal or explicit.  It may be implicit and may appear in litigation documents—such as interrogatories or motion papers—so long as it "provide[s] adequate notice that an affidavit of expert review is

---

[11]    Judah does not argue that section 145.682 is a state procedural requirement inapplicable in federal court under *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938).  *See Vogel v. Turner*, No. 11-cv-446 (PJS/JJG), 2012 WL 5381788, at *3 (D. Minn. Nov. 1, 2012) (discussing this question).  This opinion therefore assumes, as the Parties implicitly do, that section 145.682 is substantive under *Erie*.

required[.]" *Brown-Wilbert, Inc. v. Copeland Buhl & Co., P.L.L.P.*, 732 N.W.2d 209, 215 (Minn. 2007); *Martinez*, 2016 WL 5796798, at *4; *Crow v. Severs*, No. 12-cv-2216 (PJS/FLN), 2014 WL 468219, at *6 (D. Minn. Feb. 6, 2014). In a memorandum in support of their first motion to dismiss filed on April 15, 2021, Defendants raised the same argument they raise here: that Judah's claims sounding in medical malpractice should be dismissed for failure to provide an expert affidavit under section 145.682. ECF No. 23 at 16. This argument, while perhaps not a formal or explicit demand, "provide[d] adequate notice that an affidavit of expert review is required[.]" *Brown-Wilbert, Inc.*, 732 N.W.2d at 215. More than 60 days have passed since that demand, and in the intervening months, Judah has filed two amended complaints without providing an expert review affidavit. Count 10 should therefore be dismissed insofar as it seeks relief against health care providers for medical malpractice.

The only remaining question is which Defendants fall into this category. The answer depends on which Defendants are "health care provider[s]" and whether Judah asserts against them claims of "malpractice, error, mistake, or failure to cure" for which expert testimony is "necessary to establish a prima facie case." Minn. Stat. § 145.682, subds. 1–2. A "health care provider" is "a physician, surgeon, dentist, or other health care professional or hospital, including all persons or entities providing health care as defined in" a cross-referenced statute. *Id.* subd. 1. The cross-referenced statute defines "[h]ealth care" as "professional services rendered by a professional or an employee of a professional" and defines a "professional" as "a person licensed or registered to practice" in a variety of health fields. *Id.* § 145.61, subds. 2, 4. An expert-review affidavit is typically

required when a plaintiff's claim is based on conduct "connected to a [defendant's] professional licensure" or "flow[ing] from a therapeutic relationship," as opposed to "administrative or policymaking functions." *Paulos v. Johnson*, 597 N.W.2d 316, 320 (Minn. Ct. App. 1999); *see Veches v. Majewski*, No. A11-1619, 2012 WL 2202979, at *5–6 (Minn. Ct. App. Jun 17, 2012).

Based on the allegations in the Complaint and the Parties' arguments at the hearing on Defendants' motion, the Parties seem to agree that the following Defendants fit the bill: Keri A. Ovsak, David Paulson, John Barry, Laurel Sturlaugson, Michelle Breamer, Brittany K. Crock, Heather Blaschko, John Gemlo, Sharon Autio, Krista Lynn Gilpin, and Nicole Boder. Judah alleges that all of these Defendants were in health-care-provider roles and, essentially, that they failed to give him proper medical care. Count 10 will accordingly be dismissed as to these Defendants.

The Parties dispute to some degree whether the Defendants involved in Judah's psychological treatment are "health care providers" and whether Judah asserts medical-malpractice claims against them. These are Defendants Deborah K. Barron, Nicole W. Hawkins, Julie Rose, Jennifer Jones, Breanna Guthmiller, Gary Ankarlo, Elizabeth Peterson, Kimberly Ann Storm, and Andrew Bustos. There does not seem to be any doubt that psychologists and licensed psychiatric professionals are "health care providers" under the statute. *See, e.g.*, *Phillips v. Fairview Health Servs.*, No. 10-cv-4442 (MJD), 2011 WL 6151514, at *1–4 (D. Minn. Dec. 12, 2011). And Judah alleges that these Defendants falsified his treatment records and gave him unsupported diagnoses. Succeeding on these claims would require Judah to show that the reports are false and medically unsupported—

questions that go to Defendants' exercise of medical judgment.  It is therefore appropriate to dismiss Count 10 as to these Defendants insofar as it involves Judah's medical treatment.[12]

The answer is not so clear for Defendants Scott Sutton, Michael Hettig, and Susan Johnson.  First, Judah seems to allege that Sutton is not a "health care provider" because he lacks medical training.  Compl. ¶ 29.  Accepting this allegation as true, it is plausible to understand Sutton's conduct—failing to respond to Judah's medical grievances—as "administrative" in nature, not related to the exercise of medical judgment.  *Paulos*, 597 N.W.2d at 320.   It would therefore be inappropriate to dismiss Judah's negligence claim against Sutton under section 145.682.  Second, as discussed above, Susan Johnson is a "supervisor of health services," but Judah's allegations against her do not relate to his medical treatment.  Compl. ¶ 10.  Judah's negligence claim against her is accordingly not one for medical malpractice and will not be dismissed under section 145.682.  Finally, Hettig is a "clinical supervisor" who allegedly forced Judah to "go through group therapy sessions" and "falsified [Judah's] treatment records."  Compl. ¶ 30.  He prepared some of Judah's "mental health assessments," "instructed other staff to create false records regarding [Judah's] conduct," and "classified" Judah as "work ready."  *Id.* ¶¶ 57, 84.  But, according to Judah, Hettig was "not qualified" to prepare treatment records.  *Id.* ¶ 57. Accepting this allegation as true, it is plausible that Hettig was not a "professional or an

---

[12]     Not all of the allegations against these Defendants involve psychological treatment. For example, Julie Rose was partially responsible for forcing Judah to move rooms. Compl. ¶ 101.  To the extent Judah asserts a negligence claim against these Defendants that does not involve the exercise of medical judgment, it will proceed.

employee of a professional" providing health care and that he is therefore not a "health care provider."   Minn. Stat. §§ 145.61, subds. 2, 4; 145.682, subd. 1.   In short, the negligence claims against Sutton, Susan Johnson, and Hettig may proceed.

G

Finally, Defendants argue that portions of Judah's claims may be untimely.   Defs.' Mem. in Supp. at 24–25.   Judah responds that he may recover for conduct occurring before the limitations periods applicable to his claims because the conduct amounted to "continuing violations."   Pl.'s Mem. in Opp'n at 19–21.

A statute of limitations "is an affirmative defense that defendants bear the burden to plead and prove."   *Roiger v. Veterans Aff. Health Care Sys.*, No. 18-cv-591 (ECT/TNL), 2019 WL 572655, at *7 (D. Minn. Feb. 12, 2019) (citing *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 133 (2008)).   Ordinarily, then, it is not "a ground for dismissal under Rule 12(b)(6), 'unless the complaint itself establishes the defense.'"   *Id.* (quoting *Jessie v. Potter*, 516 F.3d 709, 713 n.2 (8th Cir. 2008)); *see also* 5 Arthur R. Miller, Mary K. Kane, & A. Benjamin Spencer, *Federal Practice and Procedure* § 1226 (Apr. 2021 Update).   The limitations period for each of Judah's federal claims is six years.[13]   *See Egerdahl v. Hibbing Cmty. Coll.*, 72 F.3d 615, 618 n.3 (8th Cir. 1995); *Gaona v. Town & Country Credit*, 324 F.3d 1050, 1056 (8th Cir. 2003); *Meeks v. Tenn. Dep't of Corr.*, No. 17-6292, 2018 WL 5779922, at *2 (6th Cir. May 29, 2018) (applying the same limitations

---

[13]      It is unnecessary to consider the timeliness of Judah's medical-malpractice-based negligence claims, *see* Defs.' Mem. in Supp. at 25, because those claims will be dismissed with prejudice for other reasons.  Defendants do not argue that any other portions of Judah's negligence claim are untimely.

32

period to an ADA retaliation claim as to ADA claims and § 1983 claims). Because Judah filed this action on March 3, 2021, any claims arising before March 3, 2015 would therefore be untimely.

The Complaint does not establish that Judah's federal claims are untimely. As Defendants acknowledge, Judah does not appear to "seek relief based on any alleged unlawful conduct that occurred before March 3, 2015." Defs.' Mem. in Supp. at 24. (Defendants nonetheless raise their timeliness argument "in an abundance of caution." *Id.*) Judah states that he "began experiencing severe pain" in his abdomen in approximately December 2014 and "received a colonoscopy in January[] 2015," Compl. ¶ 47, but all allegedly unlawful conduct by Defendants seems to post-date March 2015. If things change as the case progresses, Defendants can renew their timeliness argument at summary judgment.

## IV

One final matter deserves comment. Judah asks that any dismissal of his claims be without prejudice so that he can have an opportunity to amend the Complaint again. *See* Pl.'s Mem. in Opp'n at 21–22. Rule 15(a) encourages courts to grant leave to amend "when justice so requires," and the Eighth Circuit has said that "parties should usually be given at least one chance to amend their complaint," *Wisdom v. First Midwest Bank*, 167 F.3d 402, 409 (8th Cir. 1999). At the same time, however, parties should generally "not be allowed to amend their complaint without showing how the complaint could be amended to save the meritless claim." *Id.*

"[C]ourts ultimately have discretion to decide between a with-prejudice and without-prejudice dismissal." *Miles v. Simmons Univ.*, __ F. Supp. 3d __, No. 20-cv-2333 (ECT/KMM), 2021 WL 195798, at *7 (D. Minn. Jan. 20, 2021).  Dismissal with prejudice is often appropriate when a plaintiff has shown "persistent pleading failures" despite one or more opportunities to amend.  *See Milliman v. Cnty. of Stearns*, No. 13-cv-136 (DWF/LIB), 2013 WL 5426049, at *16 (D. Minn. Sept. 26, 2013).  On the other hand, when a plaintiff's claims "might conceivably be repleaded with success," particularly where discovery might reveal yet-unknown facts relevant to a dismissed claim, dismissal without prejudice may be justified.  *Washington v. Craane*, No. 18-cv-1464 (DWF/TNL), 2019 WL 2147062, at *5 (D. Minn. Apr. 18, 2019), *report and recommendation adopted*, 2019 WL 2142499 (D. Minn. May 16, 2019).

Judah will not be granted leave to amend the Complaint at this time.  Many of the arguments raised in Defendants' motion were either raised or previewed in their prior motion to dismiss.  *See* ECF No. 23.  Since that motion, Judah has amended the Complaint twice.  ECF No. 25, 28.  He did not seek leave to amend after Defendants' filed the present motion, and he has not adequately shown what changes he would make that would fix the problems Defendants identify.

Nonetheless, to the extent Counts 1, 4, 5, and 7 are dismissed, they will be dismissed without prejudice.  The Complaint's primary failing on these counts is a lack of factual allegations, not any insurmountable legal bar.  Because this case involves so many claims and so many Defendants, it is reasonable to believe that discovery may reveal information to support these dismissed counts that Judah could not have obtained before (just as it may

reveal information to negate the counts that survive). If it does, he will be able to seek leave to amend in accordance with applicable procedural rules. Count 10 is the exception. It will be with prejudice because Minnesota law requires it. *See* Minn. Stat. § 145.683, subd. 6.

## ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT** Defendants' Motion to Dismiss [ECF No. 29] is **GRANTED IN PART** and **DENIED IN PART** as follows:

1.  The motion is **GRANTED** with respect to Count 7 (Unconstitutional Custom or Practice) and that count is **DISMISSED WITHOUT PREJUDICE**.

2.  The motion is **GRANTED** insofar as it seeks dismissal of Count 1 (Deliberate Indifference) as to Defendants Jensina Rosen, Susan Johnson, and Terrance Kneisel. Count 1 is **DISMISSED WITHOUT PREJUDICE** as to those Defendants.

3.  The motion is **GRANTED** insofar as it seeks dismissal of Count 4 (Free Exercise of Religion) as to Defendants Susan Johnson, Samuel Clark, Sara Kulas, and Ann Marie Linkert-Korhonen. Count 4 is **DISMISSED WITHOUT PREJUDICE** as to those Defendants.

4.  The motion is **GRANTED** insofar as it seeks dismissal of Count 5 (Right to Counsel and Access to Courts) and that Count is **DISMISSED WITHOUT PREJUDICE**.

5.  The motion is **GRANTED IN PART** with respect to Count 10 (Negligence). Count 10 is **DISMISSED WITH PREJUDICE** insofar as it seeks recovery for medical malpractice against Defendants Keri A. Ovsak, David Paulson, John Barry, Laurel

Sturlaugson, Michelle Breamer, Brittany K. Crock, Heather Blaschko, John Gemlo, Sharon Autio, Krista Lynn Gilpin, Nicole Boder, Deborah K. Barron, Nicole W. Hawkins, Julie Rose, Jennifer Jones, Breanna Guthmiller, Gary Ankarlo, Elizabeth Peterson, Kimberly Ann Storm, and Andrew Bustos.

      6.     The motion is **DENIED** in all other respects.


Dated:  July 26, 2021             s/ Eric C. Tostrud
                                   Eric C. Tostrud
                                   United States District Court